UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH UMBACH, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. |
| | : | |
| v. | : | |
| | : | 3:08 CV 484 (EBB) |
| CARRINGTON INVESTMENT PARTNERS, ET AL. | : | |
| | : | |
| Defendants. | : | |

## RULING ON DEFENDANTS' MOTION TO DISMISS

## Introduction

Plaintiff, Joseph Umbach ("Plaintiff"), brings this action for declaratory judgment and/or equitable relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and Section 10(b) of the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and the laws of the states of Delaware and Connecticut, against Defendants Carrington Investment Partners (US), L.P. (the "Fund"), Carrington Capital Management, LLC (the "General Partner"), and Bruce Rose ("Rose") (collectively, "Defendants") in a six-count complaint [Doc. No. 1]. Defendants now move this court to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. Proc. 12(b)(6), Fed. R. Civ. Proc. 9(b), and 15 U.S.C. §78u-4(b)(3)(A) (2008), for failure to state a claim upon which relief can be granted and failure to satisfy the

pleading requirements of 15 U.S.C. §78u-4(b)(1) & (2).  For the reasons stated below, the Defendants' motion to dismiss [Doc. No. 20] is GRANTED in part and DENIED in part.

## **Background**

For the purpose of this motion to dismiss, the court accepts the following alleged facts taken from the Plaintiff's complaint as true.

### The Investment and Side Letter

On May 27, 2005, Ozcar Multi Strategies, LLC (OMS) became a limited partner in the Fund, a typical hedge fund investing in securities originating in sub prime mortgage loans.  Compl. ¶¶ 2, 4, 22.  The Fund is a limited partnership with one General Partner. Id. at ¶ 22.  Bruce Rose is the president, sole manager and member of the general partnership.  Id. at ¶ 19.

OMS invested one million dollars in the Fund and transferred its right, title and interest to Plaintiff on December 7, 2007. Id. at ¶¶ 3, 32.  The terms of the Fund are controlled by a limited partnership agreement (the "Agreement").  Id. at ¶ 5.  The Agreement does not permit limited partners to withdraw their investments during a 12-month lock-up period commencing on the date of investment.  Id.  Thereafter, limited partners may withdraw funds quarterly on 30 days' written notice.  Id.

On May 12, 2005, Defendants forwarded the Confidential

Offering Memorandum, Agreement and Subscription Agreement to plaintiff via email. <u>Id</u>. at ¶ 23. One week later, Plaintiff informed Defendants that he would not invest in the Fund due to the 12-month lock-up period in the Agreement. <u>Id</u>. at ¶¶ 25. Plaintiff said that he would only invest if any lock-up period was permanently waived with respect to his or OMS's investments. <u>Id</u>. at ¶ 26. On May 18, 2005, Rose told Plaintiff over the phone that his investments would always be redeemable upon 30 days' written notice. <u>Id</u>. at ¶ 27. Pursuant to Section 3.9.1 of the Agreement, Rose executed a Side Letter on May 27, 2005, which waived the 12-month lock-up period with respect to any investments Plaintiff or OMS might make. <u>Id</u>. at ¶ 28. Plaintiff alleges that Rose knew he would only invest if the lock-up period was permanently waived and that Rose failed to disclose that the Side Letter only waived the lock-up period for one year. <u>Id</u>. at ¶ 31. Plaintiff further alleges that Rose was motivated to make these misrepresentations because his compensation as manager was directly correlated to the amount of money invested in the Fund. <u>Id</u>. at ¶¶ 57-58.

<u>Amendment of the Agreement</u>

On July 11, 2007, OMS provided written notice of withdrawal of its investment and designated September 30, 2007 as the withdrawal date. <u>Id</u>. at ¶ 33. Under the Agreement, Defendants were required to pay 90% of the investment by October 20, and the remainder, if any, with interest after an audit. <u>Id</u>. at ¶ 9. At the time, OMS's

3

investment was valued at 1.3 million dollars.  <u>Id</u>. at ¶ 36.

On August 30, 2007, Defendants proposed an amendment to the limited partners that would impose a new one-year lockup period and rescind any withdrawal requests that had been received from limited partners.  <u>Id</u>. at ¶ 37.  Plaintiff alleges that Defendants induced other limited partners to pass the amendment by making several false representations in an accompanying email.  <u>Id</u>. at ¶ 38. Specifically, Rose is alleged to have said he proposed the amendment at the request of a majority of the limited partners and that he had significantly more than the required support for the amendment.  <u>Id</u>.  Plaintiff alleges that this amendment was defectively vague and ambiguous under the Agreement.  <u>Id</u>. at ¶ 39. The limited partners were advised that they had to vote on the amendment by September 14, 2007.  <u>Id</u>. at ¶ 41.

On September 7, 2007, the Fund proposed a second amendment, dated as of September 30, 2007.  <u>Id</u>. at ¶ 43.  This amendment instituted a new 12-month lock-up period for all investments and rescinded any pending withdrawal requests.  <u>Id</u>. at ¶ 44.  Plaintiff alleges that it contained materially different terms from the first amendment.[1]  <u>Id</u>.  The limited partners were given until September

---

[1] The first proposed amendment was written in narrative form. However, based upon the amendment election forms for the First and Second Amendments currently in evidence, there is no material difference between the First and Second Proposed Amendments.  <u>See</u> First Proposed Amendment (Pl. Ex. C); Second Proposed Amendment (Pl. Ex. E).

14, 2007 to vote on the amendment.  Id. at ¶ 45.

On September 13, the Fund proposed a third amendment, dated September 30, 2007.  Id. at ¶ 48.  The third amendment instituted a new 12-month lock-up period and rescinded pending withdrawal requests.  Id. at ¶ 49.  However, Plaintiff alleges that it contained materially different terms from both the first and second amendments.[2]  Id.  The deadline for limited partners to vote on the amendment was set at September 19, 2007.  Id. at ¶ 51.  Plaintiff and OMS made written objections concerning the legality of the third amendment, contending that it was a violation of the Agreement.  Id. at ¶¶ 53-55.  The Fund held the election and announced that the third amendment had been approved by the limited partners.  Id. at ¶ 55.  The new lock-up period was scheduled to freeze OMS's investment in the Fund until at least October 1, 2008, and the Fund has not paid OMS any portion of its investment.  Id. at ¶ 15.

Plaintiff alleges that the Defendants were motivated in taking these actions by a desire to continue the current investment strategy of the Fund and to receive larger compensatory fees for managing the Fund.  Id. at ¶¶ 57-58.  Had the amendment not passed, Defendants would have been required to dissolve and

---

[2] Specifically, as compared to the second proposed amendment, the third proposed amendment altered the changes to Sections 2.8(a) and 3.10.6, and added amendments to Sections 3.10.2 and 5.2.2. See Second Proposed Amendment 1-2 (Pl. Ex. D); Third Proposed Amendment 1-3 (Pl. Ex. F).

liquidate the Fund due to pending withdrawal requests.  <u>Id</u>. at ¶ 59.

<u>Jurisdiction</u>

Plaintiff is a resident of Florida.  <u>Id</u>. at ¶ 16.  The Fund is a limited partnership existing under the laws of Delaware with its principal place of business in Connecticut.  <u>Id</u>. at ¶ 17.  The General Partner is a limited liability company under the laws of Delaware, with offices in Connecticut.  <u>Id</u>. at ¶ 18.  Rose is an individual living in Connecticut.  <u>Id</u>. at ¶ 19.  Plaintiff alleges that this court has jurisdiction over the case under 15 U.S.C. § 78a(a), 28 U.S.C. §§ 1332(a)(1) and 2201(a).  <u>Id</u>. at ¶ 15.  Defendants have not challenged the court's jurisdiction.

**Discussion**

<u>Federal Rule of Civil Procedure 12 (b)(6)</u>

Pursuant to a Rule 12(b)(6) analysis, the Court takes all well-pleaded allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the Plaintiff.  <u>Leeds v. Meltz</u>, 85 F.3d 51, 53 (2d Cir. 1996).  A complaint should not be dismissed unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Lyons v. Legal Aid Society</u>, 68 F.3d 1512, 1514 (2d Cir. 1995)(citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957))(Federal Rules reject approach that pleading is a game of

6

skill in which one misstep by counsel may be decisive of case). "When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in [the] complaint . . ., matters of which judicial notice may be taken . . . , or documents in the plaintiff['s] possession or of which plaintiff had knowledge and relied upon on bringing suit." Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## I. Declaratory Judgment

Defendants argue that Plaintiff's request for declaratory judgment should be dismissed, and the court, in its discretion, agrees. The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not. See Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d. Cir. 2003). The statute reads, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court and Second Circuit have consistently read this permissive language as a broad grant of discretion for district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be

empowered to hear. See, e.g., Wilton v. Seven Falls Co., 515 U.S. 277, 282-83 (1995); Leather Form S.R.L. v. Knoll, Inc., 205 Fed. Appx. 861, 863 (2d. Cir. 2006); Dow Jones, 346 F.3d at 359. Ultimately, a district court only abuses this discretion "if it bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact." United States v. Couto, 311 F.3d 179, 185 (2d Cir. 2002)(citing Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir.2001)).

In exercising its discretion, the court looks to a set of factors that the Second Circuit has developed for Declaratory Judgment Act cases. See Dow Jones, Inc. v. Harrods, Ltd., 237 F. Supp. 2d 394, 432-37 (S.D.N.Y. 2002), aff'd, 347 F.3d 359 (2d Cir. 2003). This test asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969). Building on this test, other circuits have asked: (1) whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy. See, e.g., NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A., 28 F.3d 572, 577 (7th Cir. 1994);

8

Grand Trunk R.R. Co. v. Consol. Rail Corp., 746 F.2d 323, 326 (6th Cir. 1984).  Other judges in this Circuit have cited the five tests noted above, applying each of the factors to their cases.  Dow Jones, 237 F. Supp. 2d at 437-47 (declining to exercise discretionary jurisdiction).

The court does not find that either test articulated in Broadview compels a declaratory judgment on the facts in this case. While either test could be satisfied by granting declaratory judgment, this case is no longer a prospective dispute between the parties.  Indeed, Plaintiff has brought five other charges against the Defendants, any of which could provide a remedy.  Thus, the court is not persuaded that declaratory judgment serves a useful purpose or is the best way to finalize the controversy at this stage of the dispute.

The first two of the three additional tests are not pertinent to the current case.  The court sees no indications of "procedural fencing" or res judicata considerations in the request for declaratory judgment.[3] Additionally, there is nothing in the record to indicate that a declaratory judgment ruling would result in friction between sovereign legal systems.

Rather, the fifth test provides a compelling reason to dismiss

---

[3] Defendants correctly point out that Plaintiff himself is under no threat of litigation or harassment. Defs.' Mem. 27.  While not necessary for a declaratory judgment, such a threat would provide a more adequate basis for one. See Museum of Modern Art v. Schoeps, 549 F. Supp. 2d 543, 548 (S.D.N.Y. 2008).

Plaintiff's first count.  The declaratory judgment requested by Plaintiff would primarily amount to a finding of breach of contract, breach of fiduciary duty, fraud and negligent misrepresentation.[4] As such, the court has ample reason to decline the request for declaratory judgment given the five overlapping charges brought by Plaintiff.  A court does have the power to grant declaratory relief when another adequate remedy is available.  See 28 U.S.C. § 2201(a)   However, it may, in the exercise of its discretion, decline to do so.  "The test is whether or not the other remedy is more effective or efficient, and hence whether the declaratory action would serve a useful purpose." Beacon Constr. Co. v. Matco Electric Co., 521 F.2d 392, 398 (2d. Cir. 1975). Here, the court elects to allow Plaintiff's other claims to proceed, finding that this will lead to a more effective resolution of the dispute.  Defendants' motion to dismiss is GRANTED as to Count I of the complaint.


II.  **Securities Fraud**

     In Count Two of the complaint, Plaintiff alleges a violation of section 10(b) of the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

---

[4] Plaintiff specifically asks the court to rule that OMS's withdrawal request was a vested contractual right that cannot be rescinded, the third amendment was an ex post facto amendment and is therefore null and void, and that the third amendment breached the Agreement and/or was obtained fraudulently.  Compl. ¶ 60.

promulgated thereunder, against Defendants.  Compl. ¶¶ 61-65. To prove a violation of Section 10(b), a plaintiff must show that the defendant (1) made a misstatement or omission of material fact, (2) with scienter, (3) in connection with the purchase and sale of securities, (4) upon which the plaintiff reasonably relied, (5) which proximately caused the plaintiff's damages.  Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000).

As with any securities fraud claim, Plaintiff must meet heightened pleading requirements to survive a motion to dismiss. ATSI Communs., Inc. v. Shaar Fund Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). The complaint must satisfy Rule 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b).  Allegations that are conclusory or unsupported by factual assertions are insufficient. See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986).

Here, the court finds that Plaintiff has made sufficient allegations of misstatement by the Defendants.  See Compl. ¶¶ 25, 28-29, 31.  Specifically, Plaintiff has alleged that on May 19, 2005, Rose, having been advised by Plaintiff that neither he nor

his affiliated entities would invest in the Fund due to the lock-up period, told him over the telephone that OMS's investment would be redeemable at any time and would not be subject to any future lock-up period.  Id.  On Plaintiff's request, Defendants prepared a Side Letter agreement, drafted May 27, 2005, confirming the redemption right.  See Compl. ¶ 29.  They did not disclose to Plaintiff that they would not honor the quarterly redemption right if the Limited Partnership Agreement were to be amended to include a new lock-up period.  See ¶ Compl. 31.  Therefore, Plaintiff has met the four particularity requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") as laid out in Novak.

Defendants base their argument for dismissal of the securities fraud claim on two other prongs of Rothman: reasonable reliance and scienter.  Neither prong mandates the dismissal of Count II.

Reasonable Reliance

Plaintiff must have reasonably relied on a misrepresentation by Defendants to have a valid securities fraud claim.  See Rothman, 220 F.3d at 89.  The Second Circuit has held that there can be no reasonable reliance if the agreement has an integration clause that does not include the misrepresentation and the investor is sophisticated.  ATSI Comm., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007).  Defendants argue that this standard precludes any claim of reasonable reliance by Plaintiff.  The court agrees with Defendants that the Plaintiff in this case is a sophisticated

investor.  Furthermore, there were integration clauses both in the Agreement itself and in the supporting memorandum which accompanied it.  <u>See</u> Agreement Sec. 14.4 (Def. Ex. A); Subscription Agreement ¶¶ 3, 21a (Def. Ex. C).[5]

Ultimately, Defendants' request for dismissal rests upon the claim that the language in the Agreement and Side Letter is clear and unambiguous.  <u>See</u> Defs.' Mem. 6-7, 14-15.  However, when taken in context with Plaintiff's allegations, the language in the Agreement and Side Letter is not as clear as the Defendants allege in their motion.  The Side Letter exempts Plaintiff from "the 'lock-up' period as described in Section 3.9.1" of the Agreement.  Side Letter (Pl. Ex. A).  The relevant part of the Agreement states, "...a Limited Partner may not withdraw any portion of its Capital Account with respect to each of its Interests ... unless such portion has been invested with the Partnership for a period of not less than 12 months."  Agreement Sec. 3.9.1 (Def. Ex. A).  As Plaintiff has asserted, any subsequent investments by OMS in the Fund would normally have been subject to a lock-up period.  <u>See</u> Pl's Mem. 25-26. By it's plain language, the Side Letter precluded the lock-up period for OMS's initial investment, and also for any

_____

[5] Plaintiff and Defendants argue at length in their submissions to the court about the nature and legal effect of the various integration clauses contained in the Fund documents.  <u>See</u> Defs.' Mem. 7, 13-14; Pl's Mem. 3, 25-26; Defs.' Reply Mem. 4.  However, to dismiss based upon the integration clauses alone would require the court to find a level of clarity in the Agreement and Side Letter that is not present.

subsequent investments.  The Side Letter fully controlled the Agreement between Plaintiff and Defendants, "notwithstanding any provisions to the contrary in [the] Agreement."  Agreement Sec. 14.4 (Def. Ex. A).  Therefore, taking Plaintiff's allegations as true, Defendants could well have misrepresented the effect of the Side Letter as precluding any future lock-up period for his investment.

This case is therefore different from the Second Circuit precedents.  Those cases involved sophisticated investors who signed agreements that did not contain the misrepresentations they later alleged.  See Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc., 343 F.3d 189, 196 (2d Cir. 2003)("...Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement.").  Here, however, the Plaintiff took measures to protect himself.  He told the Defendants that he would not invest without assurances that no lock-up periods would be imposed, and he subsequently secured a Side Letter to control this arrangement.  Compl. ¶¶ 25-26, 28-29.  Plaintiff's wisdom in accepting the representations of the side letter as he understood them is not dispositive of the dismissal of his securities fraud claim, because the court reads ambiguities in his favor.  While Defendants argue that the Side Letter clearly refers only to the initial investment by OMS, the court is not willing to dismiss the allegations solely on the Defendants' interpretation of the word "the" in the Side Letter.

14

<u>Scienter</u>

Private securities fraud actions must meet the PSLRA's scienter pleading requirements or face dismissal. 15 U.S.C. § 78u-4(b)(3)(A). In an action for money damages requiring proof of a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Id</u>. § 78u-4(b)(2). Plaintiff may satisfy this requirement by alleging facts (1) showing that the Defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 168-69 (2d Cir. 2000). Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007). For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id</u>.

In a Rule 10b-5 action, scienter requires a showing of "intent to deceive, manipulate, or defraud," <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194 n.12 (1976), or reckless conduct, <u>SEC v. U.S. Envtl., Inc.</u>, 155 F.3d 107, 111 (2d Cir. 1998)(stating that reckless behavior is sufficient to plead scienter). Plaintiff

argues that reckless conduct provides sufficient evidence for scienter in this case. See Pl's Mem. 28.  The court agrees.

Here, Plaintiff has alleged knowing or reckless misconduct by Defendants, which is enough to survive dismissal.  See In Re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 40 (2d. Cir. 2000). Plaintiff has specifically alleged that Defendants knew that he would not invest if there were any chance his investment would be subject to a lock-up period.  Compl. ¶ 26. Therefore, Defendants consciously misrepresented the nature of Plaintiff's investment and whether the Side Letter precluded any future lock-up period. Plaintiff alleges that Defendants made these misrepresentations in order to receive greater compensation fees and continue their own investment strategies.  Compl. ¶¶ 57-58.

Defendants properly contend that scienter may not be inferred solely from the existence of executive compensation dependant upon stock value.  Acito v. IMCERA Group, 47 F.3d 47, 54 (2d. Cir. 1995)(finding that if scienter could be inferred from executive compensation, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions").  However, in Acito, the plaintiff alleged scienter based solely on increased executive compensation. There was no allegation of deliberate misrepresentation, only failure to disclose certain reports.  Id. at 52-53.  The court also found that the reports that the defendant did not disclose initially were either disclosed later or did not need to be

16

disclosed at all.  Id.  This case is different.  Plaintiff's allegations involve fraud by the General Partner in a hedge fund rather than outside directors.  Furthermore, in managing a hedge fund, Defendants allegedly had a much stronger stake in keeping money in the Fund than the outside directors who sold off their stock in Acito.  Where there are indications of fraud such as these, Acito does not necessarily apply.  See Freedman v. Value Health, Inc., 958 F.Supp. 745, 755 (D. Conn. 1997)(distinguishing Acito based, inter alia, on the closeness of the defendants to the company and timing of the actions based on alleged fraud), aff'd, 34 Fed. Appx. 408 (2d Cir. 2002).

Plaintiff has presented strong circumstantial evidence of reckless conduct:  the Defendants' executive compensation and investment strategy arising from the Fund, the allegations of conscious misrepresentations about the guarantee of the Side Letter and the Defendants' attempts to lock up Plaintiff's investment when he did request to withdraw his funds.  See Compl. ¶¶ 31, 37, 57-58.  Plaintiff has not presented anything more than circumstantial evidence of misbehavior or recklessness.  However, strong circumstantial evidence is all that is needed for the claim to survive dismissal.

Defendants' alternative explanations for these actions do not provide more likely conclusions.  The court has already rejected the argument based upon the "clear" language of the Side Letter.  Defendants also argue that they waited until after the market

17

downturn to institute the new lock-up period and that they were simply trying to protect the Fund. See Defs.' Mem. 18. Protecting the Fund after a market downturn was likely a factor in the Defendants' decision to propose the amendment. See Proposed Amendment 2 (Pl. Ex. B). However, that alone does not mean they committed no securities fraud. If the court takes as true Plaintiff's allegations that Defendants misrepresented the nature of the Side Letter, it is entirely plausible that Defendants did not need to act on their misrepresentations until two years later when Plaintiff attempted to withdraw his money.

Plaintiff has pleaded specific misstatements by Defendants upon which he reasonably relied and for which there was scienter in the form of reckless conduct. The court is satisfied that Plaintiff could prove a set of facts supporting his securities fraud claim. Defendants' motion to dismiss is DENIED as to Count II of the complaint.

## III.  **Breach of Fiduciary Duty**

Under Delaware law, a general partner owes the traditional fiduciary duties of loyalty and care to the limited partnership and its partners. See Boxer v. Husky Oil Co., 429 A.2d 995, 997 (Del. Ch. 1981)(stating that the general partner in a limited partnership is generally required "to exercise the utmost good faith, fairness, and loyalty")(citing Meinhard v. Salmon, 164 N.E. 545 (N. Y. 1928)), aff'd, 483 A.2d 633 (Del. 1984). However, the statute

18

"expressly authorizes the... modification, or enhancement of these fiduciary duties in the written agreement governing the limited partnership." Del. Code Ann. tit. 6, § 17-1101(d)(2).  Thus, the parties to a Delaware limited partnership have the power to form a limited partnership "in an environment of private ordering according to the provisions in the limited partnership agreement." Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 170 (Del. 2002).  If the limited partnership agreement unambiguously provides for fiduciary duties, any claim of a breach of a fiduciary duty must be analyzed generally in terms of the partnership agreement.  See Id. at 170-71.

Here, Plaintiff has adequately pled a complaint for breach of fiduciary duty against each of the Defendants, but only for one of the reasons alleged.  Plaintiff asserts in the complaint that the respective Defendants owe him a fiduciary duty based upon his status as a limited partner and Rose's authority to manage OMS's investment.  Compl. ¶ 67.  Specifically, Plaintiff alleges that Defendants breached their duty by improperly arranging for the adoption of the third amendment to the Agreement and misrepresenting the lock-up period before Plaintiff signed the Agreement.  Id.

Defendants correctly assert that there could be no breach prior to Plaintiff's investment because no fiduciary duty existed at the time.  Leung v. Schuler, 2000 Del. Ch. LEXIS 41, *19-20 (Del. Ch. Feb. 29, 2000), aff'd, 783 A.2d 124 (Del. 2001).  At the

19

time of the alleged breach, Plaintiff had not signed the Agreement. See Compl. ¶¶ 28, 67.  Thus, Plaintiff cannot base his claim on the allegation that he would not have invested had there been full disclosure before he signed the Agreement.  See Leung, 2000 Del. Ch. LEXIS at 20.  Plaintiff contends that Defendants violated their fiduciary duty by remaining silent after the Agreement went into effect.  Pl's Mem. 19.  On this point, Delaware law is perfectly clear.  The General Partner owed no fiduciary duty of the type claimed by Plaintiff prior to Plaintiff signing the Agreement. See Sanders v. Devine, 1997 Del. Ch. LEXIS 131, *16 (Del. Ch. Sept. 24, 1997)(no liability under any fiduciary duty theories for the disclosures made in connection with a stock offering when the plaintiff was not yet an investor).  Here, Plaintiff can prove no set of facts that give rise to a breach of fiduciary duty allegedly committed at a time when no fiduciary duty was owed him.

Plaintiff has adequately pled breach of fiduciary duty arising from Defendants' actions in securing passage of the third proposed amendment in 2007.  For purposes of dismissal, the court is satisfied that Plaintiff could prove a set of facts in which Defendants breached their fiduciary duty to him as a limited partner. Regarding the passage of the amendment, Plaintiff alleges that Defendants claimed that a majority of partners supported the amendment.  Compl. ¶ 38.  An action that causes investors to vote in favor of an amendment for reasons other than its merits can be a breach of fiduciary duty.  See Williams v. Geier, 671 A.2d 1368,

1382 (Del. 1996)(holding that, "a board of directors seeking stockholder approval of a transaction must walk a fine line between disclosures designed to inform and disclosures which may be seen as coercive").[6]   Furthermore, the Defendants distributed three amendments that contained some materially different terms before the final vote, and gave fewer than twenty days between the distribution of the third amendment and the voting deadline.  See Compl. ¶¶ 39-53.  Defendants correctly point out that Section 11.1 of the Agreement controls the amendment process for the Fund and that amendments of the lock-up provision are not specifically precluded by that section.  See Agreement Sec. 11.1 (Def. Ex. A). However, Defendants' alleged actions could have contravened the rights of the limited partners laid out in Section 6.3 of the Agreement, even if it is unclear that the Agreement specifically prohibits such action.  See Schnell v. Chris-Craft Industries, Inc., 285 A.2d 437, 439 (Del. 1971)(holding that under Delaware corporation law, "inequitable action does not become permissible simply because it is legally possible").

Plaintiff may not pursue his breach of fiduciary duty claim based on misrepresentations made prior to his signature of the

---

[6] This case presents a more misleading statement than the Proxy that was disclosed to the stockholders in Williams, but less misleading than others that Delaware courts have found to constitute breach.  See, e.g., Lacos Land Co. v. Arden Group, Inc., 517 A.2d 271, 278-79 (Del. 1986).  The alleged misrepresentations here are more similar to those in Lacos because Plaintiff alleges that they were false and contained the threat of fund liquidation. See Compl. ¶ 38.

Agreement.  However, the court finds that Plaintiff may continue to
pursue his breach of contract claim based upon the actions
surrounding the adoption of the third proposed amendment.
Defendants' motion to dismiss is GRANTED in part and DENIED in part
as to Count III of the complaint.


## IV.  <u>Fraud and Negligent Misrepresentation</u>

Defendants argue for dismissal of the fraud and negligent
misrepresentation claims for essentially the same factual reasons
as the securities fraud claim.  <u>See</u> Defs.' Mem. 19.  They assert
that these claims should be dismissed under Connecticut, Delaware
or Florida law.  <u>Id.</u> at 18.  Likewise Plaintiff argues that the law
of any of the three jurisdictions would allow his claims to
proceed.  Pl's Mem. 29.  The court finds that the claims survive
Defendants' motion to dismiss regardless of the choice of law, for
primarily the same reasons as the securities fraud claim.  Under
Delaware law, a fraud claim must allege: (1) a false
representation, (2) with knowledge or belief of its falsity, (3)
intent to induce the plaintiff to act, (4) reasonable reliance by
the plaintiff, and (5) damages.  <u>See</u> <u>Stephenson v. Capano Dev.,</u>
<u>Inc.</u>, 462 A.2d 1069, 1074 (Del. 1983).  Negligent misrepresentation
requires (1) a misrepresentation (2) that was known or should have
been known to be such, (3) intended to induce action by the
plaintiff, and (4) injury.  <u>See</u> <u>Kronenberg v. Katz</u>, 872 A.2d 568,
585 (Del. Ch. 2004) (citing <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889-90

(Pa. 1994)).  Plaintiff has alleged all the requisite elements, as outlined in the Background and Section II above.  Defendants argue for dismissal on the grounds of lack of justifiable reliance, which is an element of both common law fraud and negligent misrepresentation.  See Defs.' Mem. 19.  Specifically, Defendants contend that Delaware Chancery case H-M Wexford LLC v. Encorp, Inc. controls this case.  See Id; H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129 (Del. Ch. 2003).  In Wexford, the Delaware court dismissed fraud and negligent misrepresentation claims because they arose from alleged misrepresentations about the financial condition of Encorp that were not included in an integrated agreement.  Wexford, 832 A.2d  at 142.  However, the misrepresentations were in a separate document and their use was specifically, and boldly, disclaimed in the integrated purchase agreement.  See Id.  Here, the alleged misrepresentations relate to the Side Letter and its effect on Plaintiff's ability to withdraw his investment.  See Compl. ¶¶ 28-29.  These cannot be disclaimed by the integration clauses in the Agreement and Subscription Agreement, because the Side Letter was ambiguous and controlled the Agreement between Plaintiff and Defendants.  See Agreement Sec. 14.4 (Def. Ex. A). The court refuses to disregard the alleged misrepresentations surrounding this controlling Fund document.  For these reasons, the integration clauses alone are not dispositive for Defendants'

motion.[7]  Additionally, the claim would survive under Connecticut

or Florida law.[8]

     Defendants also cite Topf v. Warnaco, Inc. as support.  See

Defs.' Mem. 19; Topf v. Warnaco, Inc., 942 F.Supp. 762, 765

(D.Conn. 1996).  In Topf, the Plaintiff claimed to be misled as to

the existence of a clear arbitration clause in the contract he

signed.  See Topf, 942 F.Supp. at 765 (the signed agreement stated,

"this Handbook is our entire agreement concerning each party's

right to arbitrate employment disputes...").  The reasoning of Topf

would be persuasive to the court had the Agreement in this case

_____

[7] The integration clause in the Agreement (§ 14.4) and the second
in the Subscription Agreement (¶ 21(a)) would not be enough to
preclude justifiable reliance because they do not bar fraud
claims.  See Kronenberg v. Katz, 872 A.2d 568, 592 (Del. Ch.
2004)(Standard integration clauses do not bar fraud claims, "but
rather simply...limit the scope of the parties' contractual
obligations to those set forth in the written agreement.").
However, the first integration clause in the Subscription
Agreement does specifically contain anti-reliance language (¶ 3),
which could preclude justifiable reliance in an unambiguous
contract.  See Kronenberg, 872 A.2d at 592.

[8] Where integration clauses are involved, as here, courts in this
District have invoked the same standards as Delaware law.  See
Vertrue Inc. v. Meshkin, 429 F. Supp. 2d 479, 499 (D. Conn.
2006).  "Florida law is clear that if a party alleges that a
contract was procured by fraud or misrepresentation as to a
material fact, an integration clause will not make the contract
incontestable, and the oral representations may be introduced
into evidence to establish fraud."  Meterlogic, Inc. v. Copier
Solutions, Inc., 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000);
Acquisition Corp. of Am. v. Federal Deposit Ins. Corp., 760 F.
Supp. 1558, 1561 n.6 (S.D. Fla. 1991). Despite the integration
clauses, the subsequent Agreement and Side Letter are not clear
and unambiguous enough for the court to dismiss.  See Topp, Inc.
v. Uniden Am. Corp., 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007).

been as clear and unambiguous.  However, in this case, the Plaintiff relied upon the Agreement as modified by the Side Letter and the representations allegedly made by Defendants concerning the effect of the Side Letter.

On both counts, the Plaintiff has adequately pled his case. Plaintiff has alleged that Defendants intentionally and knowingly made false and fraudulent misrepresentations and omissions upon which he reasonably relied to his detriment.  He has alleged specific fraudulent communications.  Furthermore, Plaintiff has alleged that the Defendants were careless and negligent in their misrepresentations.  The integration clauses alone are not a legal defense because Plaintiff alleges that the fraud was perpetrated at least partially through the Side Letter.  Plaintiff's complaint under common law fraud and negligent misrepresentation succeeds for similar reasons as his securities fraud complaint.  Therefore, Defendants' motion to dismiss is DENIED as to Counts IV and V of the complaint.

## V.  **Breach of Contract**

According to the Agreement, Delaware law governs contractual disputes between the parties.  Agreement Sec. 14.2 (Def. Ex. A). To survive a motion to dismiss for failure to state a breach of contract claim under Delaware law, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and

third, the resultant damage to the plaintiff." <u>VLIW Tech., LLC v.
Hewlett-Packard Co.</u>, 840 A.2d 606, 612 (Del. 2003).   Here,
Plaintiff and Defendants entered into a contract, which Plaintiff
has alleged was breached.   Therefore, his claim rests on a
potential legal remedy.   Specifically, the Agreement with the
Defendants originally required payment of the money he had invested
into the Fund upon request.   <u>See</u> Compl. ¶ 32.   The Side Letter
controlled the contract between Plaintiff and Defendants and
allegedly exempts Plaintiff's investment from any lock-up period.
Additionally, Plaintiff has specifically alleged the sequence of
events that led to the denial of his request for return of funds.[9]
<u>See</u> <u>Id</u>. at 36-54.   If taken as true, Plaintiff's allegations rest
on a set of facts that could support his claim for relief.

     Defendants properly state that if a contract is unambiguous,
extrinsic evidence may not be used to interpret the intent of the
parties, to vary the terms of the contract or to create an
ambiguity.   <u>See</u> <u>Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l
Fund, L.P.</u>, 2006 Del. Ch. LEXIS 94, *10 (Del. Ch. May 24, 2006).
However, when there is uncertainty in the meaning and application

---

[9] The alleged activities of Defendants that could have led to a
breach of contract include: inducing the partners to support an
amendment through misrepresentations; proposing a vague and
ambiguous amendment; proposing an amendment that failed to
specify the provisions of the Agreement to be amended;
subsequently proposing two versions of the amendment with
materially different terms and not giving twenty days to vote on
them; and failing to comply with the Notice of Solicitation
requirement in the Agreement.

of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms. See Eagle Indus. v. DeVilbiss Healthcare, 702 A.2d 1228, 1232 (Del. 1997). Here, the parties dispute whether the proposed amendment was passed in accordance with Section 11 of the Agreement. While the Agreement itself is clear about the amendment process, a claim remains based upon the circumstances surrounding the passage of the third amendment. Plaintiff has alleged that the amendment itself is a breach of contract, and the court is unwilling to dismiss the claim by taking for granted the effect of the disputed amendment on Plaintiff's rights of withdrawal.

The parties further dispute the legal impact of the Side Letter and whether it controls or could be amended. In such a case, the court will construe the terms of the contract against the general partner, unless the specific terms were bilaterally negotiated. See SI MGMT. L.P. v. Charlebois, 707 A.2d 37, 43 (Del. 1998)("...ambiguous terms in the Agreement should be construed against the General Partner as the entity solely responsible for the articulation of those terms."). However, where language in a partnership agreement is ambiguous, the court may also look at extrinsic evidence surrounding how the contract came into existence. See Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1232 (Del. 1997). Here, Plaintiff and Defendants negotiated the terms of the lock-up period, leading to the Side Letter. Thus, the court is willing to look at Plaintiff's extrinsic allegations

of fraud in interpreting the side letter for purposes of dismissal.

Ultimately, the court refuses to dismiss the breach of contract claim on the basis of Defendants' interpretation of the Agreement and Side Letter.  Plaintiff could prove a set of facts supporting a breach of contract claim.  Defendants' motion to dismiss is DENIED as to Count VI of the complaint.

## Conclusion

For each of the reasons set forth herein, Defendants' motion to dismiss [Doc. No. 20] is hereby GRANTED in part and DENIED in part.  The remaining claims in this action are: (1) a securities fraud claim against all Defendants; (2) a breach of fiduciary duty claim against all Defendants; (3) a fraud claim against all Defendants; (4) a negligent misrepresentation claim against all Defendants; and (5) a breach of contract claim  against all Defendants.

SO ORDERED

/s/ Ellen Bree Burns, SUDJ

ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 18th day of February 2009.

28